IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

LARRY E. WOODARD, JR.                                                    PLAINTIFF

v.                            Civil No. 09-2093

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                           DEFENDANT

<u>**MEMORANDUM OPINION**</u>

Plaintiff, Larry Woodard, Jr., brings this action under 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of Social Security Administration (Commissioner)

denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security

Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review,

the court must determine whether there is substantial evidence in the administrative record to

support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

I.      <u>**Procedural Background**</u>

The plaintiff filed his application for DIB in April 2005, alleging an amended onset date

of March 2005, due to seizure disorder, neuropathy, depression, and anxiety.  (Tr. 45, 57, 88, 89-

90, 347).  His applications were initially denied and that denial was upheld upon reconsideration.

(Tr. 44-52).  Plaintiff then made a request for a hearing by an Administrative Law Judge (ALJ).

An administrative hearing was held and an unfavorable decision rendered on April 24, 2007.

(Tr. 33-38, 341-401).  On August 30, 2007, this decision was vacated by the Appeals Council

for the ALJ to review new and material evidence.  (Tr. 57-59).

A second administrative hearing was held on August 27, 2008.  (Tr. 402-426).  Plaintiff

was present and represented by counsel.  At this time, plaintiff was 39 years of age and possessed

a high school education. (Tr. 405, 407). He had past relevant work experience as an electric motor repair supervisor. (Tr. 20, 79, 345-351).

On March 5, 2009, the ALJ found that plaintiff's seizure disorder, peripheral neuropathy, and mood disorder were severe impairments, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 14-16). After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity to perform sedentary work except that plaintiff must avoid hazards including unprotected heights and moving machinery. Plaintiff cannot operate motor vehicles as part of his work and is moderately limited in the ability to make judgments on simple work-related decisions; understand, remember, and carry out complex instructions; and, respond appropriately to usual work situations and routine work changes. The ALJ also concluded that plaintiff was mildly limited in his ability to interact appropriately with co-workers and supervisors. (Tr. 16-20). With the assistance of a vocational expert, the ALJ found plaintiff could perform work as a compact assembler, lamp shade assembler, and fishing reel assembler. (Tr. 21).

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on May 28, 2009. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Docs. 14, 15).

## II.    **Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir.

AO72A
(Rev. 8/82)

2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or

3

mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**III.   Discussion**

After reviewing the medical evidence of record, the undersigned finds that the ALJ's RFC is not supported by substantial evidence. Of particular concern in the ALJ's mental RFC assessment. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the

4

claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

Records indicate that plaintiff had a history of depression and social anxiety. On November 27, 2006, plaintiff was admitted at Bridgeway in Little Rock, due to depression and suicidal ideations. (Tr. 264-269). Two days prior to admission, he felt "lost" after breaking up with his girlfriend and cut his arm with is knife. He then called 9-1-1. He had also fallen down seven steps secondary to his chronic neuropathy and injured his shoulder and his knee. Plaintiff reported feeling emotional, hopeless, and helpless. He also admitted to having six or seven beers and being angry at his girlfriend. Plaintiff indicated that his intention in cutting his arm was not suicide, rather he was just very angry. He denied any neurovegetative symptoms of depression, but did state that his mood had been increasingly depressed. Plaintiff denied any psychosis, suicidal or homicidal ideations, or sleep problems. Records indicate he had no previous inpatient history, although he had been at the Harbor House in the past for alcohol abuse. His medical history was positive for bilateral foot neuropathy including decreased sensation in his toes that impaired his balance, seizure disorder, and gastroesophageal reflux ("GERD"). A physical examination revealed mild wheezes bilaterally, a self-inflicted laceration on his left upper extremity, and a very slow finger-nose-finger exam. A slight upper extremity tremor was also noted. (Tr. 264-269).

Dr. Jeff Palmer noted that plaintiff was somewhat disheveled in appearance, but his hygiene was appropriate and his eye contact fair. (Tr. 264-269). He was cooperative with the interview, exhibited a slightly increased psychomotor status, and was frustrated, anxious, and had a congruent mood. His judgment appeared to be poor based on his self-mutilation and his

insight into his illness was merely fair.  Plaintiff's intelligence was rated as average based on his vocabulary and education.  Dr. Palmer diagnosed plaintiff with mood disorder not otherwise specified, rule out major depressive disorder, rule out adjustment disorder with disturbance, rule out marijuana abuse, rule out alcohol abuse, bilateral foot neuropathy, seizure disorder, and GERD.  His GAF upon admission was 20 with a guarded prognosis based upon his poor social circumstances and the severity of his illness.  Effexor and Neurontin were administered and plaintiff's mood responded favorably.  At the time of discharge, plaintiff was diagnosed with recurrent major depression, alcohol and marijuana abuse, seizure disorder, peripheral neuropathy, and difficulty coping with chronic mental illness.  Plaintiff was interviewed and stated that he felt ready to go home.  He was planning on living with family and regretted the break-up with his girlfriend, but felt confident about being able to get through it without any problems.  Dr. Richard Owings assessed him with a GAF of 50 and prescribed Effexor.  He was also told to resume the Tegretol, Prilosec, and Neurontin. No medication side effects were noted during his stay, and he experienced no seizures while hospitalized.  (Tr. 264-269).

On January 9, 2007, plaintiff presented for a diagnostic interview at Western Arkansas Counseling and Guidance Center.  (Tr. 270-272, 280-286, 316-326).  His problem areas included difficulty managing his anger, significant problems with anxiety and depression, feelings of low self-esteem, and sleep disturbance.  Plaintiff was seeking treatment primarily for depressive symptoms. He said his depression had affected his ability to control his anger and his self-esteem.  Plaintiff hoped that treatment would help him be better able to cope with life.  (Tr. 270-272).  He reported experiencing anxiety when in crowds, confusion, racing thoughts, irritability, impatience, and frustration.  (Tr. 270-272).  Plaintiff was alert, calm, appropriate, and reported

6

no history of violent acts or violent ideation.  No hostility was detected in his demeanor.

Plaintiff's thought processes were logical and coherent with no preoccupations and no

hallucinations, but he did experience difficulty concentrating.  He had a history of seizures with

his most recent one occurring on January 2, 2007.  At this time, he was taking Neurontin, Effexor

XR, Tegretol XR, and Prevacid.  Dinora Reyes, a licensed counselor, diagnosed plaintiff with

anxiety disorder not otherwise specified and depressive disorder not otherwise specified.  She

indicated that his prognosis was good and that he appeared highly motivated for treatment.  Ms.

Reyes recommended individual therapy, family therapy as needed, and medication management.

(Tr. 270-272).

On January 25, 2007, plaintiff presented for a medication evaluation with Barbara

Durham, a family nurse practitioner at WACGC.  (Tr. 276-277, 314-315).  Plaintiff had recently

moved from Alma to Fort Smith to live with his parents.  He had experienced no seizures since

he began taking the Tegretol regularly.  Plaintiff felt the Effexor was ineffective and reported

continued difficulty with anger, more prominent depression symptoms, and low self-esteem.  He

was cooperative and pleasant; made good eye contact; exhibited normal speech; had a depressed

but stable mood; and a broad, sad, worried, and congruent affect.  His thoughts were logical,

linear, and coherent.  Plaintiff was goal-oriented and spoke of getting more involved at church

and in therapy.  His concentration was fair to good and his judgment and insight were good.

Plaintiff denied hallucinations, delusions, and homicidal and suicidal ideation.  As he was

requesting a different medication to treat his depression, Ms. Durham switched plaintiff to

Prozac.  His medications included Prozac, Tegretol XR, and Neurontin.  (Tr. 276-277).

On March 22, 2007, plaintiff's depression was controlled via Prozac. (Tr. 273-275, 311-313). His last seizure had reportedly occurred in January when he ran his car through a house. He stated that the loss of his job as a production supervisor triggered his depression. Plaintiff reported that he experienced ten seizures while on the job, and his employer felt that he was a liability. He acknowledged hallucinations in the past, which he described as hearing noises, but also reported tinnitus, most likely related to head trauma from multiple injurious seizures. Plaintiff admitted to past alcohol abuse, stating that he quit after Christmas. However, he acknowledged having had two to three beers the previous weekend. Plaintiff's memory was in tact, he was cooperative and pleasant, his mood was good, and his affect broad and cheerful. Sonja Armstrong, an advanced nurse practitioner with WACGC, diagnosed plaintiff with major depressive disorder, rule out borderline personality disorder, grand mal seizures, and GERD. She also assessed him with a GAF of 65. (Tr. 273-275, 311-313).

On April 25, 2007, plaintiff was again treated by Ms. Armstrong for medication maintenance. (Tr. 278-279, 309-310). Plaintiff reported experiencing one mild seizure since his last appointment, resulting in an injury to his ear. He indicated that the Trazodone was ineffective for his sleep disturbance with middle insomnia continuing. Plaintiff also reported continued problems with depression. Accordingly, Ms. Armstrong prescribed Seroquel and increased his Prozac dosage. At this time, he was taking Neurontin, Prozac, Carbamazepine (Tegretol XR), and Seroquel. His medications were noted to be effective for their targeted symptoms and no medication side effects were reported. Plaintiff was referred to their indigent program to apply for indigent medication assistance. (Tr. 278-279, 309-310).

8

On May 9, 2007, plaintiff returned for a follow-up concerning his depressive symptoms. (Tr. 307-308). He stated that the increased dosage of Prozac had helped greatly. His mood was good, optimistic, calm, cheerful, positive, and minimally depressed. Plaintiff had experienced no increase in seizure activity with this increase. The Seroquel was getting him to sleep, but it caused extensive, bizarre, and weird dreams and caused him to wake up feeling very tired and unrested. This was causing him great distress, and he requested to try Lunesta or another sleep medication. Overall, he was stable, having experienced no seizures, a good appetite, and fair sleep. Ms. Durham noted that his medication was only moderately effective. Accordingly, he was prescribed Lunesta and Rozerem to help him sleep. Because he needed lab tests to effectively determine his Tegretol dosage, she recommended that plaintiff set aside a monthly amount to start saving for this. Ms. Durham indicated that plaintiff would be able to make a down payment and then make monthly installments. He was agreeable. (Tr. 307-308).

On July 26, 2007, plaintiff reported difficulty with sleep. (Tr. 305-306). The Seroquel worked well, but he was out of medication. His mood was good, slightly anxious, and only minimally depressed. Plaintiff had tried Trazodone, which gave him severe nightmares. As such, he requested to return to Seroquel and to apply for the assistance program. He also continued to experience problems with anxiety when around others. Plaintiff reported difficulty in getting out of his home and in going to Wal-mart. He felt things were closing in on him. However, there was no worsening in his feelings of depression, no suicidal or homicidal ideations, and no psychosis or bizarre thoughts. Ms. Durham noted that she would continue to adjust his medications, but wanted him to come down off the Prozac to initiate Effexor since that could possibly be obtained through the patient assistance program. Plaintiff continued to take

9

Tegretol and Neurontin for seizure disorder, which was stable at this time. Ms. Durham gave plaintiff two months to find a primary care physician to treat his seizure disorder. Because he had no insurance, she referred him to the Good Samaritan Clinic. (Tr. 305-306).

On November 2, 2007, plaintiff reported that he had been out of Effexor for two months, although he felt like it was helping him. (Tr. 304). He was beginning to get inpatient with the disability process. He was coping by staying busy with friends and family. Plaintiff stated that he enjoyed visiting when possible and was looking at spending some time with his mother and stepfather during the month of November. (Tr. 304).

On November 8, 2007, plaintiff presented after not having been seen for over four months. (Tr. 303). He stated that he continued to have the same symptomology of panic and anxiety with stressors. He had recently seen Ms. Reyes in therapy. Plaintiff admitted that his anxiety increased with the risk of seizures out in public. He had been off his Effexor for three months because he was not able to afford it. Plaintiff reported a lack of motivation, depression, and anxiety. He was sleeping on Seroquel and continued on his anti-seizure medications. Although plaintiff reported a couple of small seizures, no significant seizures were reported. Ms. Durham explained to plaintiff that he needed to get a Primary Care Physician or Neurologist to manage his seizure disorder and medication therapy. He assured her that he would follow-up with this at the beginning of the year. Ms. Durham re-initiated Effexor and advised him to continue the Seroquel. (Tr. 303).

On December 7, 2007, plaintiff presented at the Lee County Cooperative Clinic to talk about his medication and to be evaluated for collar bone pain. (Tr. 340). He also indicated that the Seroquel was not effective at helping him sleep. An examination revealed tenderness in the

right clavicle.  Plaintiff was diagnosed with a right clavicle fracture, insomnia, and depression.

The doctor prescribed Ambien in lieu of Seroquel, prescribed Robaxin to treat his clavicular

pain, and advised him to continue his other medications.  (Tr. 340).

On January 8, 2008, plaintiff underwent a mental diagnostic and psychological evaluation

with Dr. Patricia Walz.  (Tr. 287-295).  Plaintiff indicated that he had filed for disability due to

seizure disorder and neuropathy.  He reported experiencing seizures and balance issues at work

that caused him to lose his job.  Plaintiff also stated that he suffered from anxiety and "stuff like

that."  He indicated that the anxiety had begun when he lost his job and began the disability

process.  Plaintiff described anxiety attacks in Wal-Mart, which he described as pretty

overwhelming.  Obsessive-compulsive symptoms and difficulty sleeping were also reported.

However, he had experienced no depression since beginning his medication, stating "Things are

looking up."  Clumsiness and double vision were the only medication side effects noted.

Plaintiff stated that his seizures began in 1996 and had resulted in numerous head injuries and

the need for reconstructive jaw surgery.  He reported experiencing about four seizures per month,

even with medication.  Due to experiencing them in public and sustaining injuries, plaintiff

stated he was hesitant to go outside his home for fear he would experience a seizure.

For exercise, plaintiff walked around the house, to the mailbox, or three blocks to

McDonald's.  He also stated that he swept and mopped the kitchen for his dad, cleaned his own

room, and vacuumed.  Plaintiff could also mow the lawn, as long as someone was home in the

event of a seizure.  Although he could shop alone, plaintiff stated that he preferred not to do so.

Plaintiff reported having friends, stating that he occasionally played ball with the child of one

11

of his buddies. He stated that he enjoyed shooting hoops, although he was not very good on his feet, and liked watching television.

Plaintiff admitted having a prior problem with alcohol abuse, although he had been clean for at least six months. Plaintiff stated that he had participated in court ordered outpatient treatment in 1990 or 1991 at Harbor View. Aside from two DWI's, the last of which he received in 2004, plaintiff denied having a criminal history. He had recently gotten his drivers license back after having it suspended for DUI. Although he had not been forbidden from doing so by a doctor, plaintiff had not driven in three years due to seizures and vision problems.

Plaintiff's mood was euthymic, his affect consistent with his mood, his speech clear and intelligible, his thought processes logical and goal oriented, his thought content normal , and his orientation full. He did report some memory problems, often forgetting what he was doing or forgetting things he had just seen or done. Dr. Walz diagnosed plaintiff with dysthymia, social phobia, and a history of alcohol abuse in short-term remission. She also assessment him with a GAF of 50-55.[1] Ms. Walz noted that his social skills were adequate, in spite of his tic-like motor movement and his speech was clear and intelligible, but his concentration seemed to lag; he was persistent and was able to stick with tasks, but became slower as time went on; and, he tended to work very slowly.

Dr. Walz also completed a mental RFC assessment. (Tr. 293-295). She concluded that plaintiff had moderate limitations in his ability to make judgments on simple work-related decisions; understand, remember, and carry out complex instructions; make judgments on

---

[1] A GAF of 50-55 is indicative of serious to moderate symptoms or difficulties in social, occupational, or school functioning. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 34 (4th ed. 2000).

complex work-related decisions; and, respond appropriately to work situations and changes in a routine work setting due to his seizure disorder, dysthymia, and social phobia.  Dr. Walz found him to have marked limitations with regard to interacting appropriately with the public. She also opined that plaintiff's symptoms and limitations had been present since mid-2005. (Tr 293-295).

The ALJ concluded that plaintiff had only moderate difficulties with concentration, persistence, or pace, and mild difficulties in social functioning.  However, Dr. Walz's evaluation revealed that plaintiff's concentration seemed to lag; he was persistent and able to stick with tasks, but became slower as time went on; and, he worked very slowly.  She also diagnosed plaintiff with social phobia and found him to have marked limitations with regard to interacting appropriately with the public.  We note that the medical evidence does show that plaintiff experienced concentration and short-term memory difficulties, as well as social phobia. *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000) (holding that the ALJ is not free to ignore medical evidence, rather must consider the whole record).  Plaintiff was afraid to leave his home for fear of experiencing a seizure in public.  He was also very uncomfortable in crowds.  In addition, the evidence currently before the court indicates that plaintiff experienced very little social interaction at all, socializing with only a few choice friends and family members in their homes or his.  As such, we can not say that substantial evidence supports the ALJ's mental RFC determination.  We believe remand is necessary to allow the ALJ to reevaluate the evidence concerning plaintiff's mental limitations.

On remand, the ALJ should also obtain a mental RFC assessment from plaintiff's treating psychiatrist and therapist at WACGC.  *Collins ex rel. Williams v. Barnhart*, 335 F.3d 726, 730

AO72A
(Rev. 8/82)

(8th Cir. 2003) (holding that a treating physician's opinion is generally entitled to substantial weight).

IV.     **Conclusion**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 16th day of July 2010.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

14